Good morning everyone. The first case this morning is No. 2010-1204, Cancer Research against Barr Laboratories. Mr. Powers. May it please the Court. This case raises three very important legal issues. But before I get to those, I'd ask the Court to keep in mind three undisputed facts that I think are relevant to the resolution of those issues. The first is that the compounds at issue in this case are undisputedly novel, never before created. The second is that the main compound we're discussing is also undisputedly the only approved medicine for two forms of newly diagnosed brain cancer. But that's not the issue, is it? It is not. You had an application which was prefiled nine times, ten times, and you collectively didn't respond on the utility rejection. And it was ultimately allowed, essentially, on what was in the spec. Those facts were all true. So why aren't you governed by precedent? We would argue we are governed by precedent. The standard of review is abuse of discretion, right? It is, and it is always abuse of discretion to apply the wrong law. And the law that was applied here was an error. The district court here conceded, as to the question of prosecution latches, that there were no intervening rights, but argued and held that no such intervening rights are required. That was legal error under the precedent of this court and the Supreme Court, both as specifically in the prosecution latches context and in the general latches context, which we would argue is also highly relevant to this resolution. What about Woodbridge and the other Supreme Court case, which speaks to not just the rights of the parties, but the public interest in not delaying being able to use freely an invention? Agreed. Woodbridge and Webster, the two Supreme Court cases, let's take the three as a whole, because there's really only three cases we're talking about, Woodbridge, Webster, and this court's decision, the Levinson case. It's simple. All of which have two common characteristics that are both absent from this case. The first characteristic common to those cases is that there were intervening rights in all three, both as to the individual present before the court and as to others not present before the court. That second part is the answer to your question, Judge Prost, which is the public rights are not some amorphous rights in the air to have the patent end early. If so, that would apply in every case and would read out the issued prejudice completely. The rights that were present in Woodbridge, Webster, and in Sumner were the fact that the public generally was working in the area of the invention, ignorant of the final dependency of the application, and therefore the public's right to have that work continue to be valid was bridged by the dependency and latency of the timing of the prosecution. But wasn't Barr affected? Wasn't the public affected? Not at all, because neither Barr nor anyone else did what happened in Woodbridge, Webster, and Sumner, which is nobody was working in this field. Barr, in fact, did not even begin working in this field when the patent issued. It waited not until then, not even until the first FDA approval. It waited until the second FDA approval, not to then make investments in R&D in this field, but to copy exactly what we had done with the second FDA approval. But if they had acted, if they had done in 1983 what they ultimately did in 91, and the landscape, there was no difference, right, in terms of what happened between 1983 and 91 with respect to the invention, as Judge Lurie pointed out. They relied on the same information that had always been in the spec. That would have allowed Barr or another generic to go on the market sooner. Is there any question about that? The patent term now is expiring in 2013, and it otherwise would not be. There is no doubt that had Barr or some other entity entered the field earlier, they would have then created intervening rights, which would have changed the question of law, because that is a legal requirement under the law of the Supreme Court and this Court. Had they done so, then they would have had a prosecution legislature. But I'd like to address two subsets of the question that you just asked, because both, I think, are important. The first is that the question of had Barr done the same thing, they would have been able to practice. They chose not to. They chose not to, not even until then, but long after the patent issues. They weren't waiting ignorant of the patent and relying on the absence of the patent. They waited until the second FDA indication was approved. But you're shifting the responsibility for the delay on Barr, whereas the issue is really CRT, which wasn't diligent in prosecuting its application. In prosecution latches, there are two questions. One is the question relevant to the patentee, but there's a second question of prejudice to the public or the entity coming before you. In this case, there is undisputedly none. And if we were to accept that mere earlier expiration of the patent is sufficient prejudice to the public, which I think is an implicit assumption in your question, Judge Prost, then you would read out that requirement entirely. That would always be true. In this case, and the second assumption, which I think is implicit in your question, which is an important one, because it is what Barr argues, Barr argues that they would have had access to the drug earlier, the public would have had access to the drug earlier, at rates that wouldn't have been resulting from a monopoly over the patents. That's the argument they made. All of that is highly speculative and assumes that the drug would have been issued at all. That's going back and trying to recreate a reality, which is different from the reality of drug investment and drug development. Well, I guess I'm a little unclear, and I think this is an important point, so maybe you can convince me, but if the patent had issued five years earlier, if they had done what they did in 1991, in 1984, and the patent had issued earlier, and they got the FDA approval, the patent would be expiring earlier, right? The patent would expire earlier, but not by much because of the term extension, obviously. The term extension is extended to the term of patent by a number of years. Well, so if they got the patent five years earlier, if it had issued five years earlier, then we would take five years off of the 2013 date, which it's currently scheduled to expire, right? We certainly take some years off of that, but my point is that isn't the sort of prejudice which is cognizable and the prosecution latches. No case is so healthy. Well, what are we supposed to make? And I don't have the exact quote here, but it's something like from Woodbridge, the accompanying market uncertainty and denial to the public of free use of the invention. What are we supposed to take away from that? Nothing? I wouldn't take nothing away from it, but I would not take from that an assumption that that's the sort of prejudice which is cognizable because that is not the prejudice that existed in Woodbridge, Webster, or Sumner. In all three of those cases, two elements were present that are absent here. One, intervening rights, which were expressly relied upon in those cases. They're absent here. The district court acknowledged that intervening rights is absent here and that it's a requirement. Is intervening rights limited to reissues? No. Isn't it provided for in the reissue statute? It is, but intervening rights has been applied well beyond that in other contexts as well. Intervening rights in our position based on reading the Supreme Court law and reading this court's law is the touchstone for prejudice. And the difference between personal prejudice and public prejudice is whether the intervening rights were the result of acts by the party before the court or other parties in the public. That is what is required in all three cases that have found prosecution latches. It is also required by general talking pictures. It is also required by Crown Court. And the other aspect of all three cases that is missing here is that the patentee changed the claims in order to cover what had been done by those other parties in the public in the intervening period. In all three cases that occurred, Woodbridge, Webster, Simmel, all three, that did not happen here. The claims are identical. There's no dispute that that sort of pernicious behavior which prosecution latches is designed to attack, which is a party who files a general application, lies awake, watches an industry develop, and then changes the claims to capture what others have done. That is what prosecution latches is about. That's what all three cases that have found it have relied upon. And both elements are absent here. You're not relying on business justification as a justification for delay. I'm not. I'm relying upon the absence of prejudice as required by Supreme Court in this Court's precedent. It is that legal requirement, which the district court at page 32 acknowledged was missing, which acknowledged that the intervening rights were absent, but said it is not a requirement. That, in our view, is legal error. Are you also relying on justification for the delay and setting it aside because of the nature of the rejections that came from the examiner? Yes. This goes to Judge Lurie's question earlier about doing nothing. And the record, I think, is quite good on this issue. And Judges Newman and Lurie, I think, will have unique knowledge about this issue. At the time, talking about the 1980s and early 1990s, in the area of cancer specifically, and the record site for this is A1442, it was known in the PTO that if you got an objection that said, I'm sorry, I need human data for a cancer drug. It was cancer specific. And the file history here reeks of it, saying, I don't believe it. It's inherently unbelievable that you're curing cancer. And it required human data. Well, the problem I have with that argument, one of the problems is, as you point out in your brief, you think, that to the extent there was ambiguity, it got cleared up in 1995. It did. The only problem is that you proceeded in 1991 and 1992. So whatever ambiguity you think existed before 1995 was the exact same ambiguity in 92 as was in 82. But you decided to proceed in 92, whereas you didn't in 82 in light of this ambiguity, right? I think the fair statement of the file history, I think that's mostly accurate. I would add one thing to it. What happened is that you had two changes of counsel with increasing levels of experience with the Patent Office. And you also have, I think in fairness based on the reading of the file history, a somewhat of a change in attitude in the Patent Office. In the 1980s- But the attitude changed, what, with Cremona and some other cases? Brana in 95 and the MPEP changed in 95. Brana and the change in the MPEP- And CRT had some data. They did have some data. It had some data. It was not the sort of data that was understood at the time to be required for cancer. That's the testimony in the record. That if you have, for example, Phase I clinical data that's basically aimed at toxicity, rather than showing real use in humans on a large scale that's going to prove you solve cancer. There was intense skepticism in the PTO during this period. But that's, again, I'm confused because to the extent, let's assume you're right, everything changed dramatically in 1995. But you proceeded before that. So whatever- And were rejected. Assumptions- In 91 we made the same argument and it was rejected. But then you moved forward in 92. You were rejected. And what happened after the rejection? After that we got another examiner and it was finally accepted. So you proceeded. So in 1992 it was rejected. We made the arguments that were successful later, but they failed in 91 and 92, reflecting the attitudes that were then current. Which weren't the- Excuse me. Okay. Weren't there positive data in the 80s that were published? There were. Positive and mixed data, absolutely. And the question is, is that the kind of data which the patent office accepts for cancer? And the testimony was no. We're talking about generally Phase I clinical data. Phase I clinical data, as the court knows well, is typically data that's a very small sample, typically giving one dose to a group of 12 or 20 or 15 people, often in very late stages of cancer. Not to determine effectiveness, because that's not what Phase I data is for, but to determine toxicity. There were some Phase II data on not temozolomide, but midozolomide. Very likely mistake in the period. That Phase II data was also not particularly large in scale and was of mixed results. And the conclusion was that's not going to persuade the patent office that it's really curing cancer, given the skepticism. And they went forward. And the question is, is that objectively reasonable for them to have believed, as the record establishes, that many believed, and which is consistent with Brauna and the MPEP change, where Brauna and the MPEP change acknowledged that pre-'95, that was the attitude in the office and the general practice. But you got your patent pre-'95. We did. With animal data, the same animal data that was included in the specification in 1982. We got a brand-new examiner who was a primary examiner who changed. But the other examiners were saying no. We tried it earlier. Well, so why did you keep the application going? Why did you keep filing these continuations? If you thought this patent was doomed, why didn't you do one of two things, either withdraw completely from the field or say, well, we've got to get the law changed, so we're going to use this as a vehicle to challenge what we think is improper procedure by the PTO. Well, early in the stage, you're dealing with a very small not-for-profit entity that's not going to be out there changing the U.S. law and patent law. And the reason they didn't give it up, I think the record supports, at least Dr. Stevens believed in it. And the reason they didn't give it up is not because they believed it was not patentable. That's been proved it was. But because they believed they had to have a particular type of data, which they then did not have. And what changed between 1982 and 1992? Well, I would change the question slightly, but I understand. Well, except I get to have my questions. I'll answer your question, and then I'll answer a different one. What changed, in fact, was an examiner. And some examiners were tougher on this issue than others. That's a fact of life in the PTO. But that's not the right question I would ask, I would submit, because the question isn't whether they could have gotten it out. The question is whether their behavior was objectively unreasonable. That's the question of the law. And if their behavior was objectively unreasonable, then I submit there are thousands of patent prosecutors out there during that time period who are acting equally unreasonably because the evidence of record says that was the policy of the office at the time. You knew that's when you were asking for cancer. You got the response from the PTO that they got, which is, I don't buy it. You're trying to claim you cure cancer. You better really show me that you proved that evidence. What it looked like to me is that here the examiner was saying, they used the word they said, this is incredible to cure leukemia. But meanwhile, the research was ongoing. You had to keep something going in the office or else you'd have bars arising. It's not as simple as that. You were either obtaining human data or the product would die, one or the other. I think it is as simple as that. May I turn to inequitable conduct briefly? Because there are two areas I'd like to touch on. The first is an error with regard to follow. In my view, not following Kingstown. The judge, the district court here, expressly found intent based on a should-have-known standard with regard to materiality. That is the standard that Driscoll v. Ciavallo was eliminated in Kingstown, and which I know this court is obviously going to be addressing in TheraSense. There's a second legal error with regard to intent. The district court did not follow Starr Scientific, did not even address the case. Starr Scientific, of course, demands that it be the single most plausible inference from the facts to find intent. Here the district court did not find that, nor could it have. The only basis for inferring intent here was the fact that Dr. Stevens published all of this data. His conclusion was that the basis for the district court's finding of intent is you had human data, which would have been material to utility, because the human data was mixed. And there's two problems with that. The human data is not relevant to utility, because an in-rate criminal, this court's predecessor court, adopted by Brawner later, held explicitly that we hold this way because it is our firm conviction that one who has taught the public that a compound exhibits some desirable pharmaceutical property in a standard experimental animal, which is exactly what happened here, has made a significant and useful contribution to the art, even though it may eventually appear that the compound is without value in the treatment of humans. So the fact that there were mixed human results later is irrelevant, immaterial, to the question of utility. And that is the basis upon which the district court found. But the district court found intent, inferring intent solely from Dr. Stevens' publication of these results in scientific journals. Now that is, in my view, also an error, A, because it didn't follow Star Scientific, but B, because there's a very simple, obvious, and much more plausible explanation for that. There's a very different purpose for publishing scientific material in scientific journals. Dr. Stevens so testified. He said, I published all of that in the journals because I want my colleagues to know what my results are so they can follow it and do whatever they want to do and find cures for cancer. You're saying the publication of negative data negates the idea of an intent to deceive. I'm saying it's inconsistent with it for sure, but it is not a basis for finding it. Of course, the examiner doesn't necessarily get that. I'm not saying it satisfies... They didn't present it to the examiner. Precisely. I am not saying it satisfies his duty to disclose to the patent office. I'm not saying that. I am saying, as a sole basis for inferring intent, which it was here, sole basis, it is inadequate as a matter of law, because the most plausible inference for that publication is not that he was trying to deceive the patent office. It's actually inconsistent with it, as this court has held. But there's also a very rational, very logical explanation for it, which Dr. Stevens gave. I'm publishing this so my colleagues can decide what to do and have the information they need to pursue further research. And he was in Britain, and he wasn't involved in patent prosecution. He was certainly not involved in patent prosecution. The evidence is clear on that point. Okay. I think we have the argument. Let's hear from the other side, Mr. Powers. Mr. Ringgarden. May it please the Court. Members of the Court, this is an extraordinary patent prosecution. Nine years, as Your Honors have pointed out, without a single effort to forward further the patent prosecution. But the other side's led with and seems to focus more on the intervening rights issue, which seems to be more of a legal question. It is a legal question, Your Honor. So how do you deal with that? And, Your Honor, the law does not require adverse intervening rights. We have a very serious disagreement about what the law requires. None of the cases that the appellants have referred to here actually require adverse intervening rights. They all included, they all consisted of adverse intervening rights. The cases that counsel referenced did have a factual background that included some type of rights of another party. That is true. However, counsel didn't reference the Bogiesi case, which is another case. Well, Bogiesi is kind of different, isn't it? I mean, that came up from the Patent Office. That was APA review. So that's kind of a different kettle of fish. It is for those reasons, Your Honor. The procedural posture is different. But the nature of the inquiry, the standard that is set forth by the Federal Circuit, by this Court, is the same as it was in Simbaltec. And in Simbaltec, where it was first set forth, the only requirement is that you show that it be an unexplained and unreasonable delay. There is no requirement. And it was explained. It was explained. Rightly or wrongly, they were looking for a more favorable law and looking for more favorable data. In other words, they had business reasons. Is that not enough? No, it's not enough. First of all, what the district court found after hearing everything was the reason they began the prosecution in earnest in 1991 was business reasons. It was commercial reasons. And there's testimony from the patent agent, Mr. Miller. Well, what's wrong with that? Because that is contrary to what the Supreme Court said in Woodbridge. And other cases have said that you may not delay patent prosecution solely to make the term of your patent coincide with what's commercially favorable to you. So what should they have done? They got a rejection from the examiner, which says, you say you can cure leukemia. That's incredible. So they waited while they continued to collect human data. You're saying that they should have pursued that by appealing it to the board and to the courts? That was all that was available to them with that rigorous rejection that what you propose is incredible, and then they cite all of the bad things that could happen if you get a patent on curing cancer before you can cure cancer and how misleading it is and so on. So you say they could not have kept it alive as they did. They were obliged to take an appeal? That was all that was available, right? Well, they were obliged to do something, Your Honor. They did nothing. Literally nothing. They were obliged to conduct a fruitless ordered appeal? As I'm trying to understand, the examiners persisted for a good number of years saying what you've got is incredible. Show me. And they didn't have the data to show, so they kept it alive. Well, first, Your Honor, I don't agree with the concept that they didn't have the data. They did have human data. There's never been a requirement that the Patent Office would only take FDA-approved or clinical. But it didn't work? The only data were not so encouraging that they stuck with it, and itself is interesting. There was data from mitozolemide in the mid and early 1980s that showed positive results in human beings that they could have disclosed to the Patent Office had they been interested in prosecuting. You think that that difficult data would have gotten the patent and that they had an obligation? It may or may not have gotten the patent, Your Honor. That's what we don't know because they didn't prosecute. What we need to know is whether they acted unreasonably in keeping it alive while they continued their research. I think they acted unreasonably in not taking any steps to further the prosecution, Your Honor. Getting a rejection in a first office action is commonplace in the Patent Office. It's commonplace. And a reasonable patent prosecution attorney knows that you can communicate. You can engage with the examiner. And the advantage of doing that, as the district court pointed out, is that, one, you will find out what the rejection really is in the case, and, two, you will potentially further the prosecution. What we found out was when they actually did prosecute, it was wrong to say that the Patent Office was requiring human data. But a lot had happened between then. There was a time where the guidelines were changed. The possibility of chemical treatment for cancer was better recognized. By the time they made their submission of animal data that was approved and accepted by the Patent Office, the In re Brana case was still four or five years down the road. It had not happened. The MPEP had not been changed. But they did have many years of additional data. They had more data and more data that they could have provided to the Patent Office. But the patent was ultimately approved not based on any new data that had been gathered or ascertained in the intervening period. It was based on language that had existed in the specs since 1982. Is that correct? Absolutely, Your Honor. The only data the Patent Office relied on was what was in the specification. And, in fact, the patent examiner at the end relied on that data and went out and found other animal data to support it. So why isn't Mr. Powers right that this was just happenstance that suddenly came along a more liberal examiner who was willing to deal with what they thought was the right way to go, and that hadn't occurred in the earlier nine-year period? Well, in the earlier nine-year period, they first started submitting animal data before you got to the last examiner, Examiner Dennis. They first started submitting animal data when Examiner Richter was in charge. And Examiner Richter indicated that the animal data was acceptable, and we point this out in our brief, did not approve the patent, did not allow the patent, but said that the animal data was sufficient, just had a quarrel with how broad the scope of the claims would be based on that animal data. The point, Your Honor, is that you don't know what the Patent Office is going to, and this is what the district court said, you don't know exactly what the Patent Office is going to do until you prosecute the patent. And the idea that you can sit idly by for nine years without bringing anything to the attention of the Patent Office, without engaging the Patent Office in any way, is unreasonable. Mr. Lombardi, I'd like you to defend the inequitable conduct holding. Here we have a British scientist, not knowledgeable about patents. He disclosed the negative data in publications like scientists should. And the court said, under these circumstances, the court finds Stephen's publications to the scientific community a sufficient basis upon which to infer an intent to deceive. How do you get an intent to deceive out of that? Well, Your Honor, there was more than that. She was talking about a specific point in the evidence at that point that did contribute to the findings of intent to deceive. There were a number of points of fact that pointed to the intent to deceive finding by Stephens, which were pointed out by the court, the district court. One, Stephens had knowledge of the data that was disclosed in the patent specification, knew that, the data that ultimately proved to be not accurate. Had knowledge of the contradictory data. Not accurate only in a very specific sense. There were broad allegations of the kind you generally see in a patent application. Active against cancers. But there was no, correct me if I'm wrong, was there any specific data that was wrong? Yes, there was data that was wrong. Specific data. They said, Your Honor, in the specification, they make reference, it's at column four of the specification, they make reference to animal data. And they say that these compounds have proved active in these particular animal tests. And then they list 13 compounds for which they say are the most important compounds of the millions that are covered by the genus here. And the animal testing that was actually done showed that six of those important compounds, six of the 13, were inactive, and two hadn't even been tested. So there was actual inaccuracy. There was also inaccuracy. So there was negligence? No, Your Honor. This was not negligence when you know about the records. Was there any smoking gun that said, when you refile, make sure you don't disclose such and such? No, Your Honor. And I will concede this. There was one piece of evidence that was missing in this case on intent. And that piece of evidence was an admission from the inventor that he intended to deceive. But the law doesn't require that we provide that. And the mere denial by Dr. Stevens of the fact that he intended to deceive is not sufficient to establish no inequitable conduct in this case. The evidence was that he knew about the disclosure in the patent. He knew about this data that was contradictory to the disclosure. He had been advised of the duty to disclose data to the Patent Office and had signed the oath on two separate occasions. And he didn't do it. He didn't make the disclosure. Under those circumstances, the single most reasonable inference is that he intended to deceive. But no, we did not have a smoking gun. But this Court has never required that there be a smoking gun, and I think for very good reason. Can I take you back to where we started on intervening rights? Yes. We're having you jump back and forth. Do you concede that if there's a requirement, if we conclude there's a requirement of intervening rights in our case law that you lose here? If it's intervening rights in the sense that Judge Lord was referring to, at the reissue patent sense where we would have had to have developed a product before a patent issued and subsequently, yes, there is no intervening rights of that sort. I said no. What about if there's a standard that's something a little different, which includes prejudice to business or to public interest? Well, there's clearly been prejudice to business, and I would point out that in Appellant's brief, they don't specifically argue that there has to be intervening rights. They argue they use the word prejudice throughout. And so if prejudice is the standard, and again, I don't believe it is, but if it is the standard, Your Honor, that is established here. As you pointed out in your prior questions, this patent would have expired earlier than it would if it went to its current term, which is 2014. Had they prosecuted the patent, they would have gotten this patent within two years. That's how long it took once they started to prosecute the patent. If you use that as kind of a rule of thumb, this patent would have expired in 2005 or 2006. So there is a harm to Barr in terms of not being able to go to the market as of an earlier date. So this presupposes that with an early expiration, while the human tests and the research here took, I don't know, 15 years or whatever it took, that that nonetheless would have been done, although the patent was expiring? I'm trying to understand the prejudice. We're talking about prejudice to competitors, but we're also talking about prejudice to the public. And we know that this is why we have the patent system to provide products to the public. So here we have a totally recalcitrant patent examiner who says what you've announced in your specification is incredible, he says. We need human data. So they're proceeding with the data. Meanwhile, on your thesis, they should have argued with the examiner, gotten the patent, maybe, from the board, maybe from the court, maybe not at all. But nonetheless, we assume that the product development would have proceeded anyway. Now this is the tension in the whole debate about pharmaceutical patents and how long they take for development. But are you saying that that shouldn't be considered? Well, Your Honor, to the extent, I think part of what Your Honor is saying is that there's speculation here about what would have happened had it been prosecuted. Well, that's what you presented to us. Speculate that your client was seriously prejudiced because they kept the application alive, seeking whatever data they thought the office wanted. They shouldn't have done that. They should have done whatever it took, if it was doable, either to get the patent or have it wiped out. Your Honor, I don't think it's speculation to say that this patent would have expired earlier. Or at least if it is speculation, it's minimal speculation based on the facts underlying this prosecution itself. What you're telling us, the prejudice, is that your client couldn't get into this business with this product. Having an expired patent in the pharmaceutical business, as we see it here, does nobody any good. Well, Your Honor, if there was a patent that was expired, then not only my client but others in the industry could have gone into the business of the particular drug that's at issue here. Not if it hasn't been approved. Excuse me? Not if it hasn't been approved by the FDA. So how is it approved? It was approved in the late 90s. I believe it was 1999 was the first approval, Your Honor. So under your scenario of it expiring earlier, they would have had exclusive use of the drug for five, six, seven years. They have, in fact. They've had exclusive use of the drug to date based on what's happened here. But one point, Your Honor, is— We tried to understand where the public interest lies in this concern. We were not overly sympathetic to prolonged pendency. And, of course, thanks to the inventor who was publishing everything, the public knew all about the science. And they knew all about the problems. And they knew about the failures as well as the successes. And meanwhile, these industries proceeded with whatever it presumably took to get to the stage of a product available to the public. And I'm trying to understand how that fits in with your theory that the patent should have come out 10 years earlier. Because the FDA has approved a product as of 1999 and the patent extended beyond that period of time in a way that it shouldn't have extended— But how do we know we would have had the product to be approved? That's what troubles me. Your Honor, I suppose there is speculation in any inquiry that requires an assumption that things have been done differently than they actually were done in the past. You're asking us to speculate as well. Your opponent tells us that your client took another 5 or 6 years after the patent issued before challenging it. And you're asking us to speculate in what might or might not have happened in some other scenario. Well, but, Your Honor, if there is speculation, I don't believe that somebody who has unreasonably and without explanation delayed the prosecution should benefit by speculating and saying things may not have turned out the way we expect them to turn out. The point of prosecution latches is not just prejudice to Barr, it's prejudice to the patent system and the public as a whole. And what happened here was for 9 years of literally no effort to further the prosecution, they extended their patent until— they didn't engage in prosecution until it was in their commercial interest to do so. Until they had a drug that they thought was FDA approved and until they had a partner. That is not the way that prosecution should happen. And inherent in the concept of prosecution latches is the idea that prosecution should not be subjected to that type of delay and there is an inherent harm to the system and the public's free use of inventions when that type of thing happens. And that's the basis for prejudice in this case. Okay. Any more questions? Any more questions? Okay. Thank you, Mr. Lombardi. And Mr. Powers, you've both run over, so give Mr. Powers his rebuttal time. Thank you, Your Honor. I'd like to begin with prosecution latches and address three issues, if I may. The first question, which was the subject of extensive colloquy between the court and counsel for, I believe, is the question of what type of prejudice to the public is sufficient or required. The cases all rely on intervening rights as the touchstone. Every single case which is founded has relied on the presence of intervening rights of the type that we've described in a more serious way. And there's a very good reason for that, which is exactly the issue that Judge Newman was raising. When a party comes up and says, well, if the patent had expired earlier, we would have had all these rights, that assumes that everything else stays equal. The reality of drug development is that if you're not going to get a patent, often you don't do the clinical trials and the public doesn't see the product at all. And all of that is speculation. But it is at least equally plausible that under their scenario in the world, no product, no drug ever came out, no cancer patients were ever cured. That is certainly not uncommon. The question here seems to be how long the term of the patent is going to last, whether it's going to last through 2007 or 2013, not whether or not there would have been any term for the patent, right, as a practical and as a likely matter, right? I disagree. Laches is not about mere delay and about when it terminates. Laches is about prejudice in the form of intervening rights. Absent that, mere delay, merely filing continuations is common, done all the time. There is no problem with it. What makes it a problem, what makes it a defense as to which they have the burden of proof, is the presence of intervening rights that makes that delay all of a sudden something the system cares about. The system has delay constantly in the patent office for many, many reasons. Mere delay is not Laches. The law of the Supreme Court is that, the law of this court is that. And that is why intervening rights is the touchstone, because you don't have to go through the speculation. You know whether they made the investment or not, or someone else made the investment or not. It is a bright line, clear rule to establish public prejudice or the absence of it. It is their burden, they fail to meet it, they acknowledge it's not present. The second point I'd like to address quickly is counsel's assertion that no case requires intervening rights. Crown Cork and Talking General Pictures do exactly that. In the Supreme Court, they say in the absence of intervening rights, we're not going to agree that the prejudice of Laches is there. That is the argument that is present in every single case. I don't think any fair reading of the law says that intervening rights is not required. It is relied upon, dependent upon in every case which finds it, and its absence is the basis for denial in those cases which deny it, at least at the appellate level. Third, I'd like to answer the question which I believe Judge Newman asked counsel, what was CRTO obligated to do? And counsel didn't really answer the question, but that's I think an important question for this purpose. What their policy, what their appeal really, what their position of this appeal really demands is that a party faced with what appears to be a stalwart rejection, which could be solved in the future. The evidence of record is everybody knew that when you're pursuing a cancer drug, you're going to get a really harsh rejection like that, and you better come up with human data. That's in the record. It was commonly known. Now, they could have spent a lot of money as a non-profit research and fought it all the way up to the Supreme Court, or they could have filed continuations while they did data. That was also common. Under their scenario, they would ask you to impose an obligation on that entity to file one to the Supreme Court, and if they lost, drop it. That's not a requirement under the current law, nor should it be. The final point I'd like to address is counsel's assertion that we had data, human data, as to midazolamide, and he's right, we did, but that data was so mixed that midazolamide was dropped as the product. So his assertion is we should have presented this mixed data, which showed some good results, some negative results, but so mixed that we dropped that product and presented that to the PTO as the evidence the PTO was asking for that we actually cure cancer. No, what we did insensibly, rationally, was move from midazolamide to telozolamide, which at that point was showing some greater promise in animals, and do human clinicals on that. That proved ultimately to be successful. That proved to be the drug that's curing cancer in patients around the world. Now, that form of conduct, I would submit, is not unreasonable, and that is the burden, and it is their burden. With regard to intent to deceive, I'd like to answer Judge Lurie's question. There was no specific data that was wrong. It was a generalized assertion that this class of compounds has had effect, and that was clearly true. And what counsel's arguing is that there were some species within that broad genus that had been tested that had mixed results early on, also true. That does not mean the data that was presented in the patent specification was false. There was no specific representation as to a particular compound, as to particular data that has been false. It was not found below. It was not argued here. Okay. Any more questions? Any more questions? Thank you, Mr. Powers and Mr. Lombardi. Case is taken under submission.